1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANGEL VILLALOBOS,<br><br>                                  Petitioner,<br><br>          vs.<br><br>ROBERT HERNANDEZ, Warden,<br><br>                                  Respondent. | CASE NO. 09cv00363-L (MDD)<br><br>REPORT AND<br>RECOMMENDATION RE:<br>PETITION FOR WRIT OF<br>HABEAS CORPUS<br>[Doc. No. 1] |

## I.  INTRODUCTION

This Report and Recommendation is submitted to United States District Judge M. James Lorenz pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 72.1(d) of the United States District Court for the Southern District of California.  After reviewing the Petition (Doc. No. 1), Respondent's Answer and Memorandum of Points and Authorities in support thereof ("Answer") (Doc. No. 58), and the supporting documents and pertinent state court Lodgments, the Court **RECOMMENDS** the Petition be **DENIED** for the reasons stated below.

## II.  PROCEDURAL HISTORY

On September 22, 2004, Petitioner was convicted by a jury of two counts of attempted premeditated murder and two counts of mayhem in violation of California Penal Code sections 664, 187(a), 189, 203.  (Lodgment 1 at 121-28).  The jury also

1    determined that Petitioner used a knife in the commission of the crimes and that he

2    inflicted great bodily injury during the commission of the attempted murders in

3    violation of California Penal Code sections 12022(b)(1), 12022.7(a), 1192.7(c)(23) and

4    1192.7(c)(8).  (*Id.* at 7-10, 121-28).  On April 7, 2005, the trial court sentenced

5    Petitioner to serve an indeterminate term of life in state prison plus a consecutive

6    determinate term of four years.  (*Id.* at 95-97, 133).  On June 9, 2006, the California

7    Court of Appeal (Fourth District Division One) affirmed the judgment of conviction.

8    (Lodgment 6).  The California Supreme Court denied the petition for direct review on

9    August 23, 2006.  (Lodgment 8).

10        On February 25, 2007,[1] Petitioner filed a petition for writ of habeas corpus in

11   San Diego Superior Court.  (Lodgment 9).  On April 6, 2007, the Superior Court

12   denied the petition.  (Lodgment 10).  On June 25, 2007, Petitioner filed a petition for

13   writ of habeas corpus with the Court of Appeal for the Fourth Appellate District,

14   which was denied on August 30, 2007.  (Lodgments 11, 12).  On October 29, 2007,

15   Petitioner filed a petition for writ of habeas corpus before the California Supreme

16   Court.  (Lodgment 13).  The California Supreme Court denied the petition on April

17   23, 2008.  (Lodgment 14).  Petitioner filed the instant petition in this court on

18   February 23, 2009.

19        On May 27, 2009, Respondent filed an amended motion to dismiss, arguing

20   that the petition was filed after the one-year statute of limitations under 28 U.S.C. §

21   2244(d)(A).  (Doc. No. 7).  On November 12, 2009, the reviewing Magistrate Judge

22   recommended that the motion to dismiss be adopted.  (Doc. No. 14).  The District

23   Court remanded the recommendation on February 11, 2010, citing the need for an

24   evidentiary hearing to resolve disputes about Petitioner's claims for statutory and

25

26        [1]Petitioner is entitled to the benefit of the "mailbox rule," which provides that petitions are
     deemed filed upon delivery to prison officials.  See *Houston v. Lack*, 487 U.S. 266, 276 (1988); *Huizar*
27   *v. Carey*, 273 F.3d 1220, 223 (9th Cir. 2001) (application of Houston's mailbox rule to federal habeas
     filings); see also *Stillman v. LaMarque*, 319 F.3d 1199, 1202 (9th Cir. 2003) (recognizing same with
28   regard to state habeas petitions).  Here, the state habeas was signed on February 25, 2007, and this
     Court will therefore construe the Petition as having been filed on that date.

equitable tolling.  (Doc. No. 18).  On February 1, 2011, after the evidentiary hearing, the Magistrate Judge recommended denying the motion to dismiss because of Petitioner's extraordinary language barriers and limited access to prison library materials, which prevented Petitioner from timely filing his Petition.  (Doc. No. 50). The District Court adopted the recommendation on August 5, 2011.  (Doc. No. 54).

### III.  STATEMENT OF FACTS

"[A] determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  *Id.*; *see also Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997) (overruled on other grounds by *Lindh v. Murphy*, 521 U.S. 320 (1997) (stating that federal courts are required to "give great deference to the state court's factual findings."))  Accordingly, the following facts are taken from the California Court of Appeal's opinion:

*Evidence Pertaining to the Charged Offenses*

Around 7:00 p.m. on May 26, 2004, Villalobos went to the trailer where his friend Benito Bautista resided. Villalobos showed Bautista a knife and told Bautista that a drug dealer named "Bombari" wanted Villalobos and Bautista killed.FN1 About 8:00 p.m., Adrian Velazquez and Oscar Chavez knocked on the door of Bautista's trailer. According to Villalobos, Bombari had sent Velazquez and Chavez to perpetrate the killings. When Velazquez and Chavez entered the trailer, Villalobos surreptitiously climbed outside through a hole in the ceiling to the top of the trailer. Bautista, Velazquez, and Chavez stayed in the trailer and smoked methamphetamine together.

FN1. According to Villalobos, the threat from Bombari arose when Villalobos told Bombari he wanted to stop selling drugs with him. Bombari, who was unhappy with this decision, told Villalobos that "it was not very easy to leave the selling of drugs." Further, Villalobos claimed Bombari also wanted to kill Bautista because Bombari thought Bautista was selling drugs and stealing Bombari's customers.

About five or 10 minutes later, Villalobos reentered the trailer through the door.
According to Bautista, Villalobos suddenly pulled out a knife, grabbed Velazquez,
and repeatedly stabbed him. With Velazquez lying wounded on the floor, Villalobos stabbed Chavez, who was sitting on the couch. The knife handle broke while Villalobos was stabbing Chavez. Villalobos pulled a pellet gun from the waistband of his pants and shot both Velazquez and Chavez. Chavez fled the trailer and Villalobos chased him. Velazquez also ran out of the trailer.

1   At trial, Bautista was called to testify on behalf of the prosecution and Villalobos

2   testified on his own behalf. FN2 Both Bautista and Villalobos testified that at one

3   point during the attack, Bautista kicked Chavez and asked Chavez "who wants to kill us?" Chavez responded that Bombari had sent them. However,

4   according to Bautista, neither Velazquez nor Chavez had any weapons and they did not make any threats prior to Villalobos's attack. In contrast,

5   Villalobos testified that when he entered the trailer, Chavez had a gun; Chavez told Villalobos "how easy it was ... for him to get" Villalobos and

6   that "he had a mission to comply with"; and Chavez advanced towards Villalobos with the gun in his hand. Villalobos testified that Chavez

7   dropped the gun when he was stabbed, and thereafter another person (whose identity was unknown to Villalobos) came to the door, picked up

8   Chavez's gun, and left.

9   FN2. The victims did not testify.

10  Villalobos also described visits to his residence by several individuals, including

11  Bombari and Chavez, during the two days preceding the charged offenses. During the visits, the men made statements that Villalobos interpreted as

12  meaning they were looking for an opportunity to kill him. FN3 Further, several hours before Villalobos encountered Chavez and Velazquez at

13  Bautista's trailer, Chavez and Velazquez had twice arrived at Villalobos's residence, but Villalobos avoided them by staying quiet and pretending he

14  was not at home.

15  FN3. According to Villalobos, during these unwelcome visits, Bombari and Chavez on one occasion discussed whether "it was the right time ... to take

16  action against" Villalobos, and on another occasion late at night the men stated, " 'why not now,' that that was the right moment."

17

18  The day after he committed the attack at Bautista's trailer, Villalobos talked to his

19  boss (Charles Mundo), who persuaded him to turn himself in to the police. When he was interviewed by the police, Villalobos did not mention that one

20  of the victims had a gun.

21  Villalobos apparently suffered no injuries from the incident. Velazquez was cut

22  deeply across his neck, had a gun pellet in his neck, and had lacerations on his chest, back, and forearm. Chavez had a large laceration on his face, a

23  deep laceration to his arm, and a stab wound in his neck. One of the men (apparently Chavez) had a gun pellet in his scalp.

24  *Uncharged Misconduct Evidence*

25  In a motion in limine, Villalobos's counsel moved to exclude evidence regarding a

26  fight in which Villalobos was involved while in jail awaiting trial for the current

27  offenses. The prosecutor responded that he did not intend to introduce the evidence during the prosecution's case in chief. However, the prosecutor

28  stated he might seek to use the evidence if Villalobos elected to testify; for example, if Villalobos claimed his superior fighting skills explained his lack

of injuries during the charged offenses, the prosecutor might use the evidence of the jail fight (during which Villalobos was injured) to rebut such a claim. The court noted that evidence about the jail fight might also be admissible if Villalobos presented character evidence showing his peaceful and noncombative nature. Based on the prosecutor's stated intent not to introduce the jail fight evidence during the prosecution's case in chief, defense counsel agreed the in limine motion was resolved.

During trial, the defense presented good character testimony from Mundo, who had worked with Villalobos for several years. Mundo testified that Villalobos was a peaceful person. During direct examination of Mundo, defense counsel asked, "[I]f I were to tell you that he had got into an altercation, a fight, with another individual in jail while he was incarcerated for this offense, would that change your opinion about him?" Mundo responded "[n]o." On cross-examination of Mundo, the prosecutor asked Mundo if his opinion of Villalobos would change if Mundo heard that "the facts of the offense in jail were that [Villalobos] picked on somebody else, he started it; the other guy ended up finishing him, but he started it[.]" Mundo acknowledged that if he heard more facts, maybe he would have a different opinion.

After Mundo's testimony was finished, Villalobos testified. During cross-examination, the prosecutor questioned Villalobos about the details of the jail fight. According to Villalobos, he was writing while lying on his bunk, and the inmate in the bunk above him became annoyed at the light tapping sound he was making. The two men "exchanged words" and then engaged in a fistfight. Villalobos denied that he swung first. Villalobos suffered a bloody nose, and then slipped on the blood and hurt his arm. After eliciting the details of the fight, the prosecutor asked Villalobos, "So my question for you is this, sir: how is it that you have a one-on-one fistfight with a guy in jail, get a bloody nose and a hurt arm, ... yet, two guys come to kill you with a gun and you don't have a scratch?" Villalobos responded that there was a difference "between a fight and an intent to kill somebody." On redirect examination by defense counsel, Villalobos testified that he did not hit the inmate during the jail fight, no weapons were involved, he was the only one hurt, and he had never been involved in any other fights in his life.

During closing argument to the jury, the prosecutor argued that Villalobos's claim of self-defense was not plausible because of a variety of circumstances, including the fact that Villalobos sustained no injuries during his commission of the charged
offenses. To buttress the evidentiary inferences arising from the lack of injury to
Villalobos, the prosecutor repeatedly pointed to the fact that Villalobos did sustain
injuries during the jail fight.

FN4. For example, the prosecutor argued, "The idea that [Velazquez and Chavez]
raised a hand against him? No. If they had done that, we would have seen injuries on the defendant. [¶] This is the very same man that gets into a fight in jail after ... he gets booked into jail. There's a one-on-one fight, and he gets a bloody nose and a hurt arm. [¶] He takes on, he says two hitmen. One of them has a gun, and there isn't a scratch on [Villalobos].... [¶]....[¶] ... He's not Bruce Lee.... We know that because of the fight in the jail.... [¶]....[¶] [H]ow do you take on one guy one-on-one, get your nose bloodied

1    and your arm hurt, and you're able to take on two, supposedly one of which
2    is armed, killers without a scratch to yourself?"

3    (Lodgment 6 at 2-6).

### IV.  STANDARD OF REVIEW

4
5        28 U.S.C. § 2254(a), provides the scope of review for federal habeas corpus
     claims:

6            The Supreme Court, a Justice thereof, a circuit judge, or a
7            district court shall entertain an application for a writ of
             habeas corpus in behalf of a person in custody pursuant to
8            the judgment of a State court only on the ground that he is
             in custody in violation of the Constitution or laws or
9            treaties of the United States.

10       As amended by the Anti-Terrorism and Effective Death Penalty Act of 1996
11   ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, 28 U.S.C. § 2254 (d) provides:

12           (d) An application for a writ of habeas corpus on behalf of a person
13           in custody pursuant to the judgment of a State court shall not be
             granted with respect to any claim that was adjudicated on the merits
             in State court proceedings unless the adjudication of the claim -
14
15               (1) resulted in a decision that was contrary to, or involved an
                 unreasonable application of, clearly established Federal law,
16               as determined by the Supreme Court of the United States; or

17               (2) resulted in a decision that was based on an unreasonable
                 determination of the facts in light of the evidence presented in
18               the State court proceeding.

19       When determining what constitutes "clearly established federal law" under §
20   2254(d)(1), federal courts look to United States Supreme Court holdings at the time
21   of the state court's decision.  *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003).  A state
22   court's decision is "contrary to" clearly established United States Supreme Court
23   precedent if (1) the state court applies a rule different from the governing law set
24   forth in Supreme Court cases, or (2) the state court confronts a set of facts that are
25   materially indistinguishable from a Supreme Court case, but still reaches a different
26   result.  *Williams v. Taylor*, 529 U.S. 362, 405–06, 412 (2000); *Lockyer*, 538 U.S. at
27   73; *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003) (overruled in part on other
28   grounds by *Lockyer*, 538 U.S. 63).  A state court decision does not have to
     demonstrate an awareness of clearly established Supreme Court precedent, so long

1   as neither the reasoning nor the result of the state court decision contradict such

2   precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002).

3         A state court decision may involve an "unreasonable application" of Supreme

4   Court precedent "if the state court identifies the correct governing legal rule from

5   [the Supreme] Court's cases but unreasonably applies it to the facts of the particular

6   state prisoner's case." *Williams*, 529 U.S. at 407.  Alternatively, an unreasonable

7   application may be found "if the state court either unreasonably extends a legal

8   principle from [Supreme Court] precedent to a new context where it should not apply

9   or unreasonably refuses to extend that principle to a new context where it should

10  apply." *Id*; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003); *Murphy* 331 F.3d at 1067.

11  An unreasonable application of federal law requires the state court decision to be

12  more than incorrect or erroneous.  *Lockyer*, 538 U.S. at 76.  Instead, the state court's

13  application must be "objectively unreasonable."  *Id.*  Petitioner bears the burden of

14  proving the state court acted in an unreasonable, or contrary manner.  *Woodford v.*

15  *Visciotti*, 537 U.S. 19, 22 (2002).

16        The United States Supreme Court has held that "[w]here there has been one

17  reasoned state judgment rejecting a federal claim, later unexplained orders

18  upholding the judgment or rejecting the same claim rest upon the same ground."

19  *Y1st v. Nunnemaker*, 501 U.S. 797, 803 (1991).  "We think that presumption which

20  gives them no effect – which simply "looks through" them to the last reasoned

21  decision – most nearly reflects the role they are ordinarily intended to play."  *Id.* at

22  804.  When a state court does not supply reasoning for a decision, an independent

23  review of the record is required to determine if the court clearly erred in applying

24  controlling federal law.  *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).  This

25  independent review is not *de novo.  Id.*

26  //

27  //

28  //

1

## V.  DISCUSSION

2      Petitioner alleges two claims in his Petition.  Both claims derive from the

3 admission into evidence at trial of a prison fight between Petitioner and another

4 inmate.  In Claim One, Petitioner contends that he was denied his Sixth Amendment

5 right to the effective assistance of counsel when his trial counsel failed to object to

6 evidence elicited by the prosecution about the prison fight.  In Claim Two, Petitioner

7 alleges that the trial court erroneously admitted the prison fight evidence,

8 prejudicing his trial and violating his right to due process.

9      Respondent argues that both claims fail on the merits.  Respondent also

10 contends that Claim Two is procedurally barred from review because Petitioner

11 failed to make a timely and specific objection at trial.  *See Coleman* v. *Thompson*,

12 501 U.S. 722, 729–30 (1991).  Because there is a strong preference in the Ninth

13 Circuit for handling habeas claims on the merits,[2] the Court will first address the

14 merits of Petitioner's claims, and, if necessary, proceed to the procedural bar issue.

15      **A.  Due Process Claims**

16           **1.  Prison Fight Evidence Was Admissible at Trial**

17      If evidence is relevant to a fact of consequence, it is unlikely that a

18 defendant's right to due process is violated by the introduction of that evidence at

19 trial.  *See Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  When conducting habeas

20 review, federal courts are limited to deciding whether a conviction violated the

21 Constitution, law or treaties of the United States; it is not their province to re-

22 examine a state court determination on state law questions.  *Id*. at 63.

23      Here, Petitioner claims that his right to due process under the Sixth and

24 Fourteenth Amendments was violated because of the improper admission of evidence

25 about a fight he was involved in while in prison.  (Doc. 1 at 7).  During the fight,

26

27      [2]*See  Limbrix v. Singletary*, 520 U.S. 518, 525 (1997); *Franklin v. Johnson*, 290
F.3d 1223, 1232 (9th Cir. 2002).

28

1    Petitioner suffered a bloody nose and an injury to his arm.  (Lodgment 2 at 332).

2    This evidence was first adduced by the prosecution on cross-examination of

3    Petitioner's witness, Charles Mundo, who provided testimony about Petitioner's good

4    character.  (Lodgment 2 at 215–16).  The prosecutor further questioned Petitioner

5    about the fight in more detail on cross-examination.  (Lodgment 2 at 328–32).

6          Petitioner argues that the prison evidence "was not relevant to any of the

7    factors specified in subdivision (b) of section 1101 for admissibility, such as motive,

8    opportunity, intent, preparation, common scheme or plan, or identity."  (Doc. 1-1 at

9    3).  Petitioner asserts that, under California law, "[i]mproper admission of character

10   evidence pertaining to a defendant requires reversal if it is reasonably probable that

11   but for the error, the defendant would have achieved a better result."  *Id*. at 5.

12   Petitioner contends that the evidence could only be used to "marginally show" that

13   he has a disposition to fight, which is an expressly prohibited use of evidence under

14   section 1101(b).  *Id*. at 3.

15         In California, when a defendant presents a witness who testifies about a

16   defendant's good character, the prosecution may, in a limited capacity, question the

17   veracity of the testimony by probing the witness's knowledge of acts by the

18   defendant that conflict with the witness's opinion.  Cal. Evid. Code §1102(b); *People

19   v Ramos*, 15 Cal.4th.1133, 1173 (1997).  Uncharged misconduct evidence is also

20   admissible "when relevant to prove some fact ... other than [the defendant's]

21   disposition to commit" a criminal act.  *Catlan*, 26 Cal.4th at 145–46 (citing California

22   Evidence Code section 1101(b)).  When used in a non-propensity capacity, uncharged

23   misconduct evidence is admissible if relevant to rebut a defense presented by the

24   defendant.  *People v. Terry*, 2 Cal.3d 362, 396 (1970).

25         On Petitioner's direct appeal to the Court of Appeal, the court held that the

26   prison fight evidence elicited during the prosecutor's cross-examination of Mundo

27   was admissible to the extent that the evidence tested Mundo's opinion about

28

1    Petitioner's good character.  (Lodgment 6 at 9).  The Court of Appeal further

2    recognized that the evidence was properly admissible on cross-examination of

3    Petitioner in order to rebut Petitioner's claim of self-defense.  *Id*.  This Court agrees

4    with the Court of Appeal's analysis.  Evidence of the prison fight, where Petitioner

5    was attacked and had to defend himself, was relevant in providing the jury with a

6    comparable scenario to assess Petitioner's behavior when repelling attacks.  The

7    prison fight, in which Petitioner claimed he was attacked by an unarmed inmate,

8    resulted in Petitioner having a bloody nose and an injured arm.  The lack of injuries

9    Petitioner suffered when he was allegedly attacked by two men with a gun is telling

10   in light of such evidence.  To this extent, the prison fight evidence helped rebut

11   Petitioner's self-defense claim by highlighting Petitioner's lack of injuries during the

12   crime.

13        Accordingly, the Court holds that the prison fight evidence was relevant and

14   admissible at Petitioner's trial and did not violate his right to due process.

15               **2.  Even if Inadmissible, the Evidence Was Harmless**

16        For the purposes of habeas review, even when inadmissible evidence is

17   presented at trial, relief is granted only when the error had a substantial and

18   injurious effect in determining the jury's verdict.  *Brecht v. Abrahamson*, 507 U.S.

19   619, 637 (1993).  To determine whether inadmissible evidence was substantial and

20   injurious, a court will look to see if the state's other admissible evidence was

21   "weighty," if not overwhelming.  *Id*. at 639.

22        Even if the admission of the prison fight evidence was erroneous in

23   Petitioner's case, there was no "substantial and injurious effect" because the rest of

24   the evidence presented during the trial overshadowed any effect the prison fight

25   evidence may have had.  Petitioner admitted to stabbing and shooting the victims.

26   (Lodgment 2 at 274–75).  Petitioner told the police inconsistent stories about the

27   crime and did not claim that the victims had a gun until after his initial meeting

28

1   with police.  *Id.* at 275–81.  Additionally, the jury was presented with evidence of the

2   violent nature of the victims' injuries.  *Id.* at 46.  Even without the prison fight

3   evidence, the prosecution's case was "weighty."  Accordingly, there is no concern that

4   the prison fight evidence had a substantial and injurious effect on Petitioner's trial.

5          The Court recommends that Claim Two be **DENIED**.

6          **B.  Petitioner Was Not Denied Effective Assistance of Counsel**

7          Petitioner claims that his counsel's failure to object to the prison fight

8   evidence constituted ineffective assistance of counsel.  (Doc. No. 1).  Petitioner points

9   to his counsel's initial efforts to exclude this evidence in a motion *in limine* to

10  suggest that "there simply could have been no tactical reason for defense counsel to

11  fail to object to fight evidence at the time it was admitted by the prosecution."  (Doc.

12  No. 1-1 at 3).

13         The right to effective assistance of counsel is denied when a defense attorney's

14  performance falls below an objective standard of reasonableness and thereby

15  prejudices the defense.  *Strickland v.Washington*, 466 U.S. 668, 687–88 (1984).  In

16  such cases, a petitioner is required to overcome the "presumption that, under the

17  circumstances, the challenged action 'might be considered sound trial strategy'" and

18  must show both incompetence and prejudice.  *Id.* at 689 (quoting *Michel v.*

19  *Louisiana*, 350 U.S. 91, 101 (1955)).  "Judicial scrutiny of a counsel's performance

20  must be highly deferential" and there should be a strong presumption that counsel's

21  performance falls within "the wide range of reasonable professional assistance."  *Id.*

22  A showing of prejudice must assert with reasonable probability that, but for

23  counsel's errors, the result of the proceeding would have been different.  *Id.* at 694.

24         Petitioner did not challenge this evidence on his petition for writ of habeas

25  corpus to the Court of Appeal.  On Petitioner's direct appeal of his conviction to that

26  court, however, the Court of Appeal addressed the admissibility of the prison fight

27  evidence.  Although the Court of Appeal's analysis is not binding on federal habeas

28  review, the court's application of California law to Petitioner' case is persuasive.

1    Identifying *Strickland* as the governing standard for ineffective assistance of
2    counsel claims, the Court of Appeal held that Petitioner's counsel was reasonable in
3    not objecting to the evidence because counsel likely understood the futility in
4    objecting to admissible evidence.  (Lodgment 6 at 7).  As discussed, introducing
5    evidence about a prison fight involving Petitioner was relevant to rebut Petitioner's
6    claim of self-defense.  The Court further reasoned that when the prosecutor elicited
7    evidence of the prison fight, defense counsel knew that the fight had already been
8    brought to the jury's attention during the examination of Petitioner's witness.  *Id*. at
9    9.  The Court concluded that, once the fight had been brought to the jury's attention,
10   it was reasonable for Petitioner's counsel to find it advantageous for Petitioner to
11   give his version of the prison fight rather than to seek to exclude the evidence.  *Id*.

12   Despite broad assertions that there was "no tactical reason" for counsel to not
13   object, Petitioner does not refute the explanations and reasonable strategies
14   proffered by the Court of Appeal.  Instead, Petitioner only explains how the prison
15   fight evidence was inadmissible to show a propensity to fight.  He does not suggest
16   how his counsel's objections could overcome the valid admission of the evidence as a
17   rebuttal to Petitioner's self-defense claim.

18   Accordingly, the Court does not view Petitioner's counsel's actions as
19   unreasonable and there is little to suggest how Petitioner's trial was prejudiced by
20   his counsel's failure to object to the prison fight evidence.  In light of the
21   overwhelming evidence against Petitioner, the prison fight was not dispositive in the
22   case's  ultimate outcome.

23   Accordingly, the Court recommends Claim One of the Petition be **DENIED.**
24   //
25   //
26   //
27   //
28

09cv00363-L (MDD)

## C.  Procedural Default

The existence of a procedural default does not bar a federal court from reviewing a habeas claim on the merits unless the last state court to render judgment in the case "clearly and expressly" states that its judgment rests on a state procedural bar.  *Harris v. Reed*, 489 U.S. 255, 263 (1989).  Because a procedural default is not a jurisdictional bar to reviewing the merits, a reviewing court is not required to address the issue *sua sponte*.  *Trest v. Cain*, 522 U.S. 87, 89 (1997).

The California Supreme Court denied Petitioner's habeas petition with a citation to *In re Swain*, 34 Cal. 2d 300, 304 (1949) and *People v. Duvall*, 9 Cal.4th 464, 474 (1995).  (Lodgment No. 14).  These citations suggest that the court denied the claim as "procedurally deficient for failure to comply with state rules requiring him to 'allege with particularity the facts upon which he would have a final judgment overturned' and 'include copies of reasonably available documentary evidence supporting the claim[s], including . . . affidavits or declarations.'"  *Barrera v. Attorney Gen. of Cal.*, No. 09-16222, 2012 WL 1926028, at *1 (9th Cir. May 29, 2012) (interpreting *Swain/Duvall* citations) (internal citations omitted).  Although 'failure to comply' deficiencies might be cured in a renewed petition, a petitioner's failure to file a renewed petition in the California Supreme Court does not *per se* establish a failure to exhaust state remedies.  *Id.* (citing *Kim v. Villalobos*, 799 F.2d 1317, 1319 (9th Cir.1986)).

The Court need not address the merits of Respondent's procedural bar argument.  Under § 2254 (b)(2), courts are explicitly authorized to address the merits of a habeas claim despite a petitioner's failure to exhaust state remedies.  In the Ninth Circuit, there is a strong preference for reviewing habeas corpus claims on the merits.  *Limbrix v. Singletary*, 520 U.S. 518, 525 (1997); *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002).  Especially when the procedural bar issues are complex and the petitioner's claims clearly fail on the merits, courts are encouraged to simply address the merits.  *Limbrix*, 520 U.S. at 525.

1

## VI. CONCLUSION

2    For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the

3 District Court issue an Order: (1) approving and adopting this Report and

4 Recommendation and (2) denying Petitioner's petition for writ of habeas corpus.

5    **IT IS HEREBY ORDERED** that any written objections to this Report must

6 be filed with the Court and served on all parties no later than **August 10, 2012**.

7 The document should be captioned "Objections to Report and Recommendation."

8    **IT IS FURTHER ORDERED** that any reply to the objections shall be filed

9 with the Court and served on all parties no later than **August 24, 2012**.   The

10 parties are advised that failure to file objections within the specified time may

11 waive the right to raise those objections on appeal of the Court's order. *See Turner*

12 *v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998).

13    **IT IS SO ORDERED**.

14 **DATED: JULY 19, 2012**

15

16                                                            Hon. Mitchell D. Dembin

17                                                            U.S. Magistrate Judge

18

19

20

21

22

23

24

25

26

27

28

09cv00363-L (MDD)